[Civ. No. 19552. Second Dist., Div. Two. Sept. 11, 1953.]

ELBERT, LTD. (a Corporation), Respondent, v. FED-
ERATED INCOME PROPERTIES (a Corporation),
Appellant.

James M. Gammon for Appellant.

John F. Bender and Gizella M. Allen for Respondent.

FOX, J.—Defendant appeals from an interlocutory judgment in an action for the partition of real property.

This suit for partition was filed by plaintiff corporation in September, 1950, as tenant in common with defendant corporation of an undivided one-half interest in a vacant lot located in the county of Los Angeles. Defendant's answer admitted that it claimed an interest in the property but alleged it had expended certain sums for the common benefit and prayed that it be awarded this sum from the sale of the property, plus a reasonable attorney's fee, in addition to its one-half share of the net proceeds.

The evidence discloses that defendant's title to the property derives from its purchase of a tax deed from the State of California in December, 1945, for which it paid the sum of $70. At that time, the property was subject to a lien of plaintiff's street improvement bond, issued November 17, 1930, under the Boundary Line Act of 1911. Plaintiff's lien was carried into title through foreclosure proceedings pursuant to which it received a certificate of sale on December 3, 1948. It received its treasurer's deed on June 12, 1950.

Subsequent to its acquisition of its tax deed in 1945, defendant paid the current yearly taxes accruing up to and including the year 1949, in the sum of $90; it paid $238.58 to redeem a certificate of sale which had been issued on another street improvement bond which was a lien on the property at the time defendant purchased its tax deed, and it paid $25 to Leslie Wood, the record owner of the fee prior to the tax sale, for a quitclaim deed to the property. Defendant also disbursed $22.50 for a title search by the Title Insurance and Trust Company and expended the sum of $100 as costs and attorney's fees in a quiet title proceeding against the county of Los Angeles, which appeared to have an interest in the property for sums advanced by it as relief payments to the former feeholder. These expenditures, totalling $494.98, were incurred before plaintiff received its treasurer's deed in 1950, for which it paid $450.56.

Following a trial, the court found that plaintiff and defendant were tenants in common, by virtue of parity of titles, each owning an undivided one-half interest in the property, with plaintiff holding an equitable lien of $450.56 and defendant holding an equitable lien of $70 based on the amounts paid for the treasurer's deed and the tax deed respectively. It found that all of the expenditures made by defendant and enumerated above occurred prior to the date the treasurer's

deed was issued to plaintiff on June 12, 1950. The court ordered partition by sale, holding that plaintiff had a lien for $450.56 and defendant a lien for $70, and adjudged that defendant was not entitled to reimbursement for its expenditures prior to June 12, 1950. The court further decreed that from the proceeds of the sale, after payment of referee's fees and expenses incident to the sale, there be paid to plaintiff the sum of $450.56 and to defendant $70, with any balance equally distributed to the parties. The decree also awarded to plaintiff reasonable counsel fees and costs, including the cost of abstract of title, the necessity for which and its availability for the use of the parties plaintiff had alleged in its complaint.

Defendant essentially raises two issues for consideration, each of which contains elements requiring particularized discussion. These are:

(1) Did the court err in failing to reimburse defendant from the proceeds of the partition sale for the sums it expended:

(a) In paying annual taxes levied on the property through 1949;

(b) In bringing a quiet title action against the county of Los Angeles;

(c) In obtaining a report of title search;

(d) In redeeming the treasurer's certificate of sale obtained by the holder of a bond lien;

(e) In procuring a quitclaim deed from the record owner of the fee.

(2) Did the court err:

(a) In awarding costs and authorizing counsel fees to plaintiff in the interlocutory decree;

(b) In not awarding a similar relief to defendant.

The parties are in accord that the respective tax liens of plaintiff and defendant are on a parity. (Rev. & Tax. Code, § 3900; *Monheit* v. *Cigna*, 28 Cal.2d 19 [168 P.2d 965, 167 A.L.R. 995].) ██ As a consequence of such liens having been carried into deeds acquired by private purchasers, "each tax purchaser is entitled upon sale to receive the price paid for his interest plus half of the excess proceeds consistent with ownership of an undivided one-half interest in the property as a tenant in common. [Citations.]" (*Anger* v. *Borden*, 38 Cal.2d 136, 139 [238 P.2d 976].) Relying on this rule, and making reference to general principles of subrogation, defendant contends that it is entitled to reimbursement for each item of expense already mentioned prior to the division

of proceeds of a partition sale. Plaintiff's reply to this is disarmingly simple: since no cotenancy existed at the time of these advances, defendant cannot support its claims either on the theory of subrogation or contribution.

It is beyond cavil that all of the expenditures occurred prior to the creation of a tenancy in common between the parties in June of 1950. ■ However, although the action of partition is of statutory origin in this state, it is nonetheless an equitable proceeding (*Goodale* v. *Fifteenth Dist. Court*, 56 Cal. 26; *Emric* v. *Alvarado*, 64 Cal. 529 [2 P. 418], and in its evolution has been conditioned and controlled by the broad principles governing equity jurisprudence. (*Jameson* v. *Hayward*, 106 Cal. 682, 687-688 [39 P. 1078, 46 Am.St. Rep. 268].) ■ Whenever a party affirmatively seeks relief through the interposition of the remedy of partition, the courts have adhered, in adjusting the rights of cotenants and defining their interest in the common property, to the classic formulas encapsuled in the maxims that equity is equality and he who seeks equity must do equity, and have dispensed equitable relief only upon condition that the equitable rights of a cotenant are respected and safeguarded. (*Ventre* v. *Tiscornia*, 23 Cal.App. 598, 605 [138 P. 954]; *Willmon* v. *Koyer*, 168 Cal. 369 [143 P. 694, L.R.A. 1915B 961].) ■ We must therefore examine defendant's claims in harmony not only with these established principles, but cognizant that equity, which penetrates beyond the form to the substance of a controversy, is nonetheless bound by the prescriptions and requirements of the law.

Defendant's claim of reimbursement for taxes must be disallowed. ■ The tax deed obtained by defendant from the state conveyed to him a complete title (Rev. & Tax. Code, § 3712; *Helvey* v. *Sax*, 38 Cal.2d 21, 24 [237 P.2d 269]) subject only to the continued existence of designated tax and assessment liens of equal rank as an encumbrance on the property. (Rev. & Tax. Code, § 3520; *Monheit* v. *Cigna*, *supra*; *Elbert, Ltd.* v. *Nolan*, 32 Cal.2d 610, 615 [197 P.2d 537]; *Neary* v. *Peterson*, 1 Cal.2d 703, 705 [37 P.2d 82].) As owner of the fee, defendant could have at any time discharged such liens by payment of the amount due. ■ Further, defendant would have been entitled to any rents or profits produced out of the property by virtue of its status of title holder. (Rev. & Tax. Code, § 3712; *People* v. *Maxfield*, 30 Cal.2d 485 [183 P.2d 897]; see *Merchants Finance Corp.* v. *Kuchel*, 83 Cal.App.2d 579 [189 P.2d 513].) ■ Prior to its accession to the position of cotenant, plain-

tiff was a mere lienholder with no right to share in any yield from the property, and with no warrant to exercise any rights of ownership therefrom. The taxes paid by defendant were solely its own obligation, a corollary of its ownership of the fee. Just as its failure to pay taxes would in no way prejudice plaintiff's lien so did defendant's payment of such taxes confer no boon upon plaintiff for which it should be obliged to reimburse defendant. ■ Likewise, by the express mandate of section 798 of the Code of Civil Procedure, that part of defendant's outlay of $100 in the quiet title action against the county of Los Angeles which it paid out as counsel fees is not chargeable as a part of defendant's lien. ■ So, too, the sum of $22.50 spent for a title search was an expenditure for defendant's own purposes, to ascertain for its own use the identity of interested parties and to inform itself of outstanding liens, encumbrances or clouds on its title. It contributes nothing to the present action nor does it inure to the common benefit; and to be compensable, under section 799 of the Code of Civil Procedure, its procurement should be pleaded in the complaint, in which should also be stated its availability for the inspection and use of all the parties to the action. Defendant has made no such showing.

■ With respect to defendant's payment of the sum of $238.58 to redeem a certificate of sale issued upon a street improvement bond which was a lien upon the property at the time defendant purchased its tax deed, a different situation prevails. The determination of this issue depends on the answer to the crucial question of whether the certificate of sale which defendant redeemed after foreclosure of a bond lien (hereafter called Bond 48) was issued in favor of a lienholder whose bond lien was paramount or subordinate to the bond lien through which plaintiff derived his parity title (hereafter called Bond 568). ■ Priority between successive assessment liens represented by bonds depends, of course, on the provisions of the statutes in force at the time the bonds were issued. ■ Applying elementary principles of security transactions to the case at bar, if the lien of defendant's Bond 48 was junior to that of plaintiff's Bond 568, then it cannot be said that defendant's redemption of the certificate of sale issued upon the foreclosure of Bond 48 contributed any benefit to plaintiff. For in any event, the property would have remained subject to plaintiff's senior lien, with the ever present possibility that in the event of a subsequent foreclosure by the senior lienholder, the property could be sold

and conveyed free and clear of the junior lien, upon the junior lienholder's failure to exercise his right of redemption. Thus it is obvious that no interest of plaintiff's was served if defendant merely paid off a lien over which plaintiff's lien had priority. ▮▮▮ But if, on the other hand, Bond 48 was superior to Bond 568, then it is patent that defendant has protected and helped to perpetuate and preserve plaintiff's lien. For under such circumstances, unless plaintiff itself had exercised its right of redemption by paying off the paramount lien of Bond 48, its rights as a junior lienholder could have been completely wiped out upon conveyance of the property to a purchaser at a foreclosure sale. ▮▮▮ In such a situation, defendant, having paid off the obligation not as a stranger or intermeddler but to protect his own interest, would become entitled to subrogation. (*Diehl* v. *Hanrahan,* 68 Cal.App.2d 32, 37 [155 P.2d 853].)

Turning now to a consideration of the question of priority as between the successive assessment liens of plaintiff and defendant, the record shows that plaintiff's Bond 568 was issued on November 17, 1930, under the provisions of the Boundary Line Act of 1911 (Stats. 1911, ch. 496, p. 1018, as amended Stats. 1929, ch. 817, p. 1712). It has been stipulated between the parties that the certificate of sale which defendant redeemed was issued as a result of the foreclosure of an assessment bond issued on November 12, 1930, under the Street Improvement Act of 1911 (Stats. 1911, p. 730, as amended Stats. 1927, p. 1407). ▮▮▮ "It is well-established in this state . . . that in the absence of any statutory enactment establishing a rule of priority for special assessment and bond liens, that such liens are ranked in the inverse order of their creation, that is to say that the last in point of time is superior in rank, or is first in priority." (*Cullinan* v. *Grey,* 18 Cal.2d 247, 249 [115 P.2d 460].) It will be noted that at the time of the issuance of plaintiff's Bond 568 there was in effect the 1929 amendment to the Boundary Line Act of 1911 (Stats. 1929, ch. 817, p. 1712), whose section 11 effected an amendment of section 37 of the Boundary Line Act then in force. The pertinent language of that amendment of section 37 relating to the issuance of improvement bonds reads (p. 1727): "Any council . . . passing a resolution of intention . . . shall have power . . . to determine that serial bonds shall be issued to represent assessment of twenty-five dollars or more for the cost of the . . . improvement authorized by this act, . . . and the said

bonds shall be issued under the provisions of *part three* of an act of the Legislature entitled . . . (here follows the title of the Street Improvement Act of 1911) . . . approved April 7, 1911, as amended and as the same may hereafter be amended. . . . The said provisions of said part three of said act and the amendments which may hereafter be made thereto are hereby incorporated in and adopted as a part of this act . . .'' (Italics added.) In other words, the issue as to the priority of the respective bonds is governed, as far as concerns defendant, by the provisions of the Street Improvement Act of 1911, in its entirety, and so far as plaintiff is concerned, by the provisions of part three of the selfsame act relating to the issuance of bonds representing assessment liens, which is incorporated into the Boundary Line Act of 1911, as amended.

Adverting now to the applicable language of the Improvement Act of 1911 at the dates here pertinent (Nov. 12, 1930, defendant's bond; Nov. 17, 1930, plaintiff's bond), we find in part three of said act section 66, which refers to the liens of assessment bonds. Section 66 provides in part: ''. . . said assessment shall be a first lien upon the property affected thereby until the bond issue for the payment thereof, and the accrued interest thereon and the penalties, if any, shall be fully paid according to the terms thereof.'' (Stats. 1923, p. 280.) It is under this section that the lien of plaintiff's bond is created and by which priority is established. Thus in *Balaam* v. *Pacific States Sav. & Loan Co.*, 219 Cal. 612 [28 P.2d 1053], which involved a dispute as to priority between two bonds issued under the Street Improvement Act of 1911, it was held that the rule of inverse priority applies, so that the bond issued last in time was inferior in rank. It was argued by the holder of the earlier bond that such bond merely stood in place of and continued the cash assessment lien provided for in section 23 of the act, which at that time provided that upon recordation of an assessment ''the several amounts assessed shall be a lien upon the lands . . . assessed . . . for a period of two years from the date of said recording, unless sooner discharged; such lien shall be subordinate to all special assessment liens previously imposed upon the same property, but it shall have priority over all special assessment liens which may thereafter be created against said property.'' (Stats. 1923, p. 115.) However, the court rejected the contention that section 23 regulated priority of liens when bonds had been issued to represent unpaid assessments by deciding

that two separate and distinct assessment liens were created under the act. One lien arose by virtue of section 23, which creates a cash assessment lien, the other by section 66, under which a lien arises by the issuance of the bond itself.

However, the law as announced in the Balaam case was changed by legislative intervention in 1927, when section 23 of the Improvement Act of 1911 was amended. (Stats. 1927, p. 1407.) As already noted, section 23 had previously provided that the amounts assessed upon recordation of the assessment should be a lien "for the period of two years from the date of said recording unless sooner discharged."* This sentence was followed by the provision that such lien should be subordinate to all previously imposed special assessments, but superior to subsequent special assessment liens. The 1927 amendment provided that the amount assessed under section 23 should be a lien, and should continue as a lien "until it be discharged of record." The sentence regulating priority remained unaffected by the amendment. In construing the effect of the 1927 amendment in *Thompson* v. *Clark*, 6 Cal.2d 285 [57 P.2d 490], the court was called upon to decide priority between a bond owned by plaintiff issued in 1930 under the Improvement Act of 1911 and a bond owned by defendant issued under the Bond Act of 1915. It was held that by operation of the 1927 amendment to section 23, defendant's earlier bond was superior in right to the later bond of plaintiff. The court pointed out that the rationale of the Balaam case was that the bond lien of section 66 was a different lien from the cash assessment lien created under section 23. But by force of the 1927 amendment to section 23, the lien there created henceforth continued not for two years but until it is discharged of record. If a bond is issued, such discharge can occur only when the bond issued to represent the assessment is paid in full; the life of the lien under section 23 was thus extended to the exact time required to discharge the bond lien. Its effect, therefore, was to make the liens referred to in section 23 and section 66 identical. Therefore, the order of rank set forth in section 23, which assigns priority to liens created earlier in time, governs also the bond liens referred to in section 66. This rule was reiterated in *Cullinan* v. *Grey*, 18 Cal.2d 247 [115 P.2d 460], which involved an action to

---

*It may be noted that the counterpart of section 23 is section 11 of the Boundary Line Act. Section 11 contains the identical language quoted from section 23, and has never been amended. There is no provision therein regulating priority.

foreclose a bond issued in 1926 under the Improvement Act of 1911. Defendant held a bond issued in 1929 under the Street Opening Bond Act of 1911 (Stats. 1911, p. 1192). It was held that plaintiff's bond, issued earlier in time, was entitled to priority.

In applying these principles to the situation here presented, it is recalled that the defendant's Bond 48 was issued on November 12, 1930, five days earlier than the bond lien which plaintiff carried into title coequal with defendant's tax title. We must hold therefore that sections 23 and 66 of the Street Improvement Act of 1911, when considered together as said sections read in 1930, made the lien represented by Bond 48 superior to the later assessment lien represented by plaintiff's Bond 568. It follows that in paying off a lien superior to plaintiff's, which would have remained a lien against the land even if plaintiff had at any time earlier foreclosed his junior lien, defendant has made it possible for plaintiff to become a parity title holder without being subject to such encumbrance.

Plaintiff attempts to resist the equity of defendant's position by comparing it to the status of a hypothetical owner of property subject to a first and second mortgage who has paid off one of these mortgages. Plaintiff argues that such owner could not be subrogated as against the owner of the remaining mortgage. But this analogy is fallacious. In the supposed case, the owner's obligation is solely his own, and his failure to pay would result in the foreclosure of his rights. In the instant case, had defendant not redeemed the certificate of sale, its holder would have become a parity title holder with defendant and it would have been plaintiff, as holder of a subordinate lien, whose rights would have been jeopardized if not eliminated.

Plaintiff maintains that in any event, because such lien was discharged prior to the time it became a tenant in common with defendant, defendant is not entitled, as to it, either to subrogation or contribution. This argument is clearly untenable, for as has already been indicated, defendant has paid off a lien superior to plaintiff's which plaintiff itself would either have had to redeem, as a junior lienor, or hazard the extinguishment of its rights upon a sale of the property by the dominant lienor. That such a lien no longer exists, and that no third party with a superior lien and paramount right is on the scene is of undeniable financial advan-

tage to plaintiff. Elementary concepts of fair and equitable apportionment between the parties should require that an allowance be made for this expenditure. Nor are we without authority to uphold such a conclusion. Section 2903 of the Civil Code provides: "Every person having an interest in property subject to a lien, has the right to redeem it from the lien, at any time after the claim is due, and before his right of redemption is foreclosed, and, by such redemption, becomes subrogated to all the benefits of the lien, as against all owners of other interests in the property, except in so far as he was bound to make such redemption for their benefit."

In the case of *Diehl* v. *Hanrahan*, 68 Cal.App.2d 32, 37 [155 P.2d 853], the court states: "It is the general rule that the right of subrogation is given to one who, having a lien upon specific property, discharges a prior lien thereon in order to protect his own claim; and this notwithstanding that he was not compelled to do so." (*Cf. District Bond Co.* v. *Pollack*, 19 Cal.2d 304 [121 P.2d 7] ; 16 Cal.Jur. 349-351.) It should not matter in an equitable proceeding that this transaction, culminating in the elimination of a prior lien-holder, took place before plaintiff became a tenant in common with defendant. It is a measure of the virility and flexibility of equitable principles that they may be applied to the end that neither party is permitted to secure an advantage to the prejudice of another and that the interest of one party will not be diminished in any degree to advance the interests of another.

Furthermore, defendant's redemption of an out-standing assessment lien which was superior to plaintiff's lien may also be considered as constituting a part of its *investment* in acquiring the property and perfecting the tax title it purchased. When so considered, the following language in *Monheit* v. *Cigna, supra,* (pp. 27-28) becomes particularly pertinent on the question of defendant's right to have such payment included as a part of its lien: "Also, since the property was originally subject to more than one lien on an equal basis, that is, without priority, the property should be subject to liens to the extent of the respective purchase prices paid. In that manner *each purchaser is given the full benefit of the investment* made by him in the purchase of the property. Otherwise absurd results would follow. One purchaser of the property would receive his interest for a few dollars, while another might have paid thousands. To effect *equality and parity* as between the coowners there is

therefore necessarily *an equitable lien against the property in favor of each cotenant to the extent of the amount paid by him.* The result of such liens as between the cotenants would be that in the event of the subsequent sale of the entire property, each cotenant would be entitled to reimbursement for the amount paid by him before equal division of any excess.'' (Italics added.) In the case at bar we are presented with an *a fortiori* situation, for the property here involved was subject to special assessment liens of unequal rank *inter se,* and with the lien of Bond 48, which defendant redeemed having priority over plaintiff's bond. In line with the philosophy of the Monheit case, we entertain no doubt that the amount paid by defendant to discharge a lien superior to plaintiff's lien is properly included in establishing the measure of defendant's equitable lien on the property in order that he may be ''given the full benefit of the investment made by him in the purchase of the property.'' Otherwise, one of the ''absurd results'' apprehended by the court in the Monheit case would follow, for it cannot be gainsaid that an opposite conclusion would confer upon plaintiff an undeserved windfall, a truly unjust enrichment.

Finally, and of equally compelling significance, is the fact that such a conclusion is consonant with the broad statutory policy underlying the legislative pattern in treating the problem engendered by the existence of assessment liens and parity titles. (*Cf. Stafford* v. *Realty Bond Service Corp.,* 39 Cal.2d 797, 805 [249 P.2d 241].) ■ In a line of cases culminating in *Monheit* v. *Cigna, supra,* it was established that liens emanating from the assessments of separate taxing entities were on a par, and a tax deed from one such agency would not extinguish a coequal lien. However, in 1945 the Legislature enacted comprehensive changes affecting the duration and enforcement of assessment liens, which constituted a ''revision of the entire subject.'' (*Rombotis* v. *Fink,* 89 Cal.App.2d 378, 390 [201 P.2d 588].) This legislation, now embodied in section 2911 of the Civil Code and section 330 of the Code of Civil Procedure, provided for a statute of limitations and a definite period of time upon the expiration of which street improvement liens would be not only unenforceable by foreclosure but also would be presumed to have been extinguished. (*Scheas* v. *Robertson,* 38 Cal.2d 119, 125 [238 P.2d 982].) This legislation was actuated by a recognition of the deleterious effect which such liens had

upon property, which remained fallow, unimproved and unproductive, and completely sterile as a source of tax income to the community. (See *Rombotis* v. *Fink, supra.*) It would not be in furtherance of the legislative design to allow a lienholder to sit back while a tax-title holder develops the property and renders it income-and-tax-productive by improvement or other means entailing the investment of funds, and then, by the grace of section 752, Code of Civil Procedure, to reduce his lien to a parity title and be permitted to partition and share equally in the increased value of the property. There would then be little incentive for one holding a tax title, with sufficient money only to improve the land but not fully to disencumber it, to invest his capital therein. The specter of such a lienholder becoming, as here, a cotenant equally entitled to share in his labors would haunt and daunt him. While this is not the precise case before us, it is an analogous one, and from it should emerge the principle that one holding an after-acquired parity title who exercises the right of partition should be compelled to make an equitable adjustment as between him and an earlier tax title holder whose expenditures in connection with the property redound to the common benefit. This would accomplish the ultimate objectives of preventing the accumulation of tax delinquent land in the hands of the taxing authorities and providing added incentive for the improvement and disencumbrance of such lands and making them positive contributors to the public revenue.

Whether defendant is justified in its contention that it should be reimbursed for its costs (exclusive of attorney's fees) expended in the quiet title litigation against the county of Los Angeles is a question which is prematurely raised upon this appeal from the interlocutory judgment. That this item may, under proper circumstances, be legitimately apportioned between cotenants is clearly recognized by section 798 of the Code of Civil Procedure which provides: "If it appear that other actions or proceedings have been necessarily prosecuted . . . by any one of the tenants in common, for the protection, confirmation or perfecting of the title, . . . the court shall allow to the parties to the action, . . . all the expenses necessarily incurred therein, except counsel fees, which shall have accrued to the common benefit . . . and the same must be pleaded and allowed by the court, and included in the *final* judgment, . . ." (Italics added.) Thus, such an allowance, where proper, can only

be awarded in the final judgment, and the court properly excluded such determination from its interlocutory order. Similarly, the cost of procuring a quitclaim deed from the record owner, if found to be a reasonable expense for the common benefit, can only be allowed upon final judgment. We may observe in passing, however, that we are unable to agree with plaintiff's argument that merely because the expenses were incurred prior to the existence of the tenancy in common between the parties, such expenses cannot be allowed. In the light of our previous discussion of the equitable and public policy considerations which should control an action of this nature, it is our conviction that the court's final determination should be based not on when these expenses were incurred but rather as to whether such expenses were reasonable, served to advance the purposes of the partition proceeding, and whether they were ultimately for the common benefit. It is a matter of widespread knowledge that tax titles of every character have been viewed with great distrust by potential buyers,—who all too frequently and rudely discover they have purchased little more than a lawsuit. (*Sheeter* v. *Lifur,* 113 Cal.App.2d 729 [249 P.2d 336] ; 62 Harv.L.Rev., 93.) The merchantability of a title and in consequence the price which will be paid for the property it represents is clearly enhanced by a quitclaim deed from the record owner of the premises as well as by the removal of claims which becloud the title. The court, in computing the quantum of the lien of each of the parties, upon the completion of the partition sale, should not be foreclosed from awarding to each party such expenses in these respects as it may find were reasonably incurred in facilitating the salability of the land and in assisting in securing a merchantable title to the ultimate purchaser.

The final question presented relates to the provision in the interlocutory decree awarding costs and authorizing fees for plaintiff's attorney. The court erred in so doing. The law is clearly established that costs or attorney's fees may not be allowed until the final judgment is entered and have no proper place in the interlocutory decree. (*Broome* v. *Broome,* 179 Cal. 638, 645 [178 P. 525] ; *Harrington* v. *Goldsmith,* 136 Cal. 168, 170 [68 P. 594] ; *Williams* v. *Wells Fargo Bank & U. Tr. Co.,* 56 Cal.App.2d 645, 652 [133 P.2d 73] ; 20 Cal.Jur. 639.) In *Broome* v. *Broome, supra,* it is stated that ''the subject of fees and costs [is] to be determined by the final findings and judgment,'' and in *Williams*

v. *Wells Fargo Bank, supra,* the court states "that whether the services of the attorneys for either or both parties have been for the common benefit, and the reasonable value thereof is a matter for determination at the conclusion of the litigation, at which time such fees may be specified and included in the final judgment." This long-entrenched point of law is in no whit altered by the case of *Elbert, Ltd.* v. *Nolan,* 32 Cal.2d 610 [197 P.2d 537]. In that case, plaintiff brought an action for partition and declaratory relief. The court denied plaintiff's right to partition and rendered a *final judgment* quieting title in defendant subject to the lien of the unpaid amounts of plaintiff's bonds. Upon appeal, the court reversed, holding that plaintiff had the statutory right to bring a partition action. In further declaring plaintiff's rights, the court determined that plaintiff was entitled to reimbursement for costs of partition and attorney's fees. No question was involved as to the propriety of including such costs and fees in an interlocutory decree, and the decision, in directing the court to order a partition sale, in no way intimates that attorney's fees shall be awarded at any time other than in accord with the practice established by the cases previously cited.

For the reasons stated, the interlocutory judgment of partition and order of sale is modified by adding the sum of $238.58 to the amount of defendant's equitable lien therein decreed and striking therefrom the award to plaintiff of costs and counsel fees. As so modified, the judgment is affirmed. Each party to bear its own costs on appeal.

Moore, P. J., and McComb, J., concurred.